IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SHARON POUGH,                          )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )      No.  07 C 760
                                       )
MARY E. PETERS, Secretary, etc.,       )
                                       )
                    Defendant.         )

<u>MEMORANDUM OPINION AND ORDER</u>

Sharon Pough ("Pough") has brought this action against her former employer, the Federal Aviation Administration ("FAA"),[1] charging it with two violations of Title VII of the Civil Rights Act of 1964 ("Title VII," 42 U.S.C. §§2000e to 2000e-17)[2]: (1) employment discrimination on the basis of race and national origin and (2) retaliation.  Pough's Complaint also asserts that she was subjected to a hostile work environment and that she was constructively discharged.

Secretary has now moved for summary judgment under Fed. R. Civ. P. ("Rule") 56.  For the reasons stated here, that motion is granted in its entirety.

_____

[1] As is required when any agency of the federal government is involved, the named defendant is the Secretary of the Department of Transportation ("DOT"), now Mary E. Peters. Accordingly all references to the defendant will simply employ the term "Secretary."

[2] Citations to Title VII provisions will take the form "Section--," referring to the Title 42 numbering rather than to Title VII's internal numbering.

## Summary Judgment Standard

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (<u>Leach v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (<u>Pugh v. City of Attica</u>, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (<u>id.</u>). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby</u>, Inc., 466 U.S. 242, 248 (1986)).

What follows is a summary of the facts viewed in the light most favorable to nonmovant Pough, but within the limitations created by the extent of her compliance (or noncompliance) with the strictures of LR 56.[3] And that obviates the need, in the

---

[3] LR 56.1 implements Rule 56 by requiring each party to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which are agreed upon. This opinion cites to Secretary's supporting memorandum and Pough's responsive memorandum as "S. Mem. --" and "P. Mem. --," respectively, and to their respective statements of fact as "S. St. ¶--" and "P. St. ¶--." Additional statements of fact that Pough submitted in response to Secretary's motion for summary judgment are referred to as "P. Add. St. ¶--." Where an

evidentiary recital, to repeat "according to Pough" or the like
or to identify any conflicting account, though inclusion of the
latter is sometimes called for as a purely informational matter.

**Facts**

From 1991 through early 2003 Pough worked in the FAA's Human
Resources Office, Great Lakes Region ("Great Lakes"), located in
Des Plaines, Illinois (S. St. ¶3). During that time Pough worked
primarily on equal employment opportunity ("EEO") issues and held
positions such as Equal Employment Manager and Supervisory EEO
Specialist (S. St. ¶4). During that same time frame Pough also
filed several EEO charges on her own, asserting race-based
discrimination and retaliation (S. St. ¶¶5-6, 12).[4]

Pough's path to her current lawsuit began on February 9,
2003, when her position was reassigned from that of Supervisory
Management Specialist at Great Lakes to that of Personnel
Management Specialist for the Center for Management Development

---

assertion in either party's LR 56.1 statement is undisputed by
the opponent, this opinion includes only a citation to the
original statement.

[4] Indeed, fully four such charges preceded the one that has
given rise to this lawsuit. Pough provides great detail as to
the circumstances surrounding those complaints in her P. Add. St.
¶¶50-83. But many of those facts have been the subject of other
lawsuits brought in this district (S. Mem. 5) and have little if
any bearing on the central claim raised in Pough's instant
complaint: that Secretary tried to transfer Pough, but no other
non-African-American or non-complaining employees, from the Great
Lakes Region to Florida (Complaint ¶¶11-13). There is no reason
to recite those other facts here.

("Management Development") (S. St. ¶8).  Although Management
Development is headquartered in Washington, D.C., Pough's 2003
reassignment did not entail a geographic relocation--she
continued to work at Great Lakes (S. St. ¶¶9-10).  Pough's
reassignment was ordered by Mary Ellen Dix ("Dix"), the Deputy
Assistant Administrator for Human Resources Management at FAA's
national headquarters in Washington, who acted upon the
recommendation of Pough's immediate supervisor Karen Johnson
("Johnson"), Great Lakes' Manager of Human Resources Services (S.
St. ¶¶7-8).

In her new position Pough had a new immediate supervisor--
Barbara Smith ("Smith"), Director of Management Development--
although Dix remained Pough's "second-level" supervisor (S. St.
¶11).  Pough later brought an EEO action challenging her
reassignment to Management Development on the ground that it
constituted a demotion that had been motivated by race-based
discrimination and retaliation (S. St. ¶12).

Beginning in 2004 Pough was assigned to a special detail
that involved working on a national project for the migration of
the new Federal Personnel and Program Systems (S. St. ¶13).
Pough worked on that project full-time for nearly a year and a
half before she retired from the FAA altogether (id.).  During
that time she did not operate in her capacity as an employee of
Management Development (id.).

In October 2004 Management Development was renamed the Center for Management and Executive Leadership ("Executive Leadership") (S. St. ¶14). At the same time it was "organizationally reassigned" from the Administration for Human Resources to the Administration of Regions and Center Operations (id.). That renaming and reshuffling was part of an agency-wide reorganization during which more than 120 FAA employees received reassignments (S. St. ¶15). Yet Pough responded to these changes by filing still another EEO charge (S. St. ¶16). That November 8, 2004 charge complained that as a result of the agency reorganization she had been allocated an undesirable office space that had no window and that was not conducive to wearing skirts (id.).

On June 12, 2005 Jay Weisz ("Weisz"), a male white, replaced Smith as Director of Executive Leadership (S. St. ¶17). In so doing Weisz became Pough's direct supervisor, a role that required him to fund her position and maintain her personnel, time and attendance records (S. St. ¶¶17-18). During the months that Weisz supervised Pough he never met her, for he did not work at Great Lakes and therefore spoke with Pough only by phone (S. St. ¶18). Weisz had no information about her prior EEO activity (id.).[5]

---

[5] Pough admits that Weisz supervised her and maintained her personnel, time and attendance records, but she attempts to deny that he did not have any information regarding her prior EEO

While Pough worked for Executive Leadership her second-level supervisor was Robert Igo ("Igo"), Deputy Superintendent of the FAA (S. St. 19). Throughout Pough's tenure at Executive Leadership, she and Igo never met personally (id.). Secretary states that Igo was not aware of any of Pough's previous EEO activity (id.; S. Ex. A. at 75), but Pough seeks to deny that as well.[6]

In a November 23, 2005 letter Weisz notified Pough that she "was being administratively reassigned from her 'out-stationed/virtual position' as a Personnel Management Specialist" at Great Lakes (S. St. ¶20). Effective January 9, 2006 her new

activity (P. St. ¶18). Pough seeks to support that denial by pointing to the answers she gave in response to an EEO investigator's interrogatories (id.). In those answers Pough explained that her previous EEO activity "was well known" by senior FAA and DOT officials, that a copy of her reassignment letter was placed in her personnel folder, that she filed an EEO charge involving a "hostile work environment" claim and that she reported that filing to a number of officials (id.). But none of those facts, even if true and even with the benefit of any reasonable inferences, undercut Secretary's statement that Weisz "had no information as to [Pough's] prior EEO activity" (S. St. ¶18), particularly as Pough never mentions Weisz as one of the officials who knew of her earlier complaints or whom she had notified of her hostile work environment complaint (P. St. ¶18). Secretary's statement is thus admitted in its entirety.

[6] Pough asserts that Igo knew of her prior EEO activity because she reported her hostile work environment claim to "administrator Garvey Staff member (Rochelle who later contacted Robert Igo)" (P. St. ¶19), and she attempts to support that assertion by pointing to one of the answers she provided in response to the EEO investigator's interrogatories (S. Ex. A at 53-54). But that type of ipse dixit bootstrap lifting doesn't work for reasons comparable to those set out in n.5.

position would be as a Program Management Specialist at the Executive Leadership Center in Palm Coast, Florida (id.).[7]  Weisz explained that the decision to reassign Pough was based on "sound management considerations," the general needs of the FAA and a more specific need for additional on-site program managers at Executive Leadership to help oversee numerous tasks on which contractors were working (id.).  That explanation adhered to the FAA's policy governing reassignment, as set forth in its Human Resource Policy Manual (S. St. ¶21).[8]  According to that policy the FAA pays any travel and transportation costs "incurred in connection with an involuntary reassignment that results in required relocation" (id.).

Less than one week later (on November 29) Pough's doctor prepared a medical certificate advising that Pough was scheduled to undergo major surgery on December 1, 2005 and that she would require six to eight weeks for recovery (S. St. ¶22).  About the same time Pough communicated with the administrator's office in Washington to complain that "Weisz was badgering her a couple of

---

[7]  After the 2004 agency-wide reorganization Pough had been the only Executive Leadership employee who did not report to work at the Florida facility--a situation occasioned by the earlier-mentioned special detail assignment on which she was working. There were no other Executive Leadership positions or duties that could be performed from the Great Lakes location.

[8]  Under that policy "managers may reassign employees involuntarily without loss in grade or base pay from one position to another, within or outside the local commuting area, when such action is considered to be the best interest of the FAA."

days prior to her surgery and gave the impression that she might be placed on AWOL" (S. St. ¶23). According to a statement Pough later made to an EEO investigator, Weisz's actions fitted into a larger pattern she had witnessed while with FAA (S. St. ¶25; S. Ex. A at 50). She said that such badgering was "the tactic of choice" employed by FAA human resources managers who "relentlessly retaliated against employees while they were recovering from life threatening illnesses" (id.).

On January 9, 2006[9] Pough's doctor prepared a medical certificate clearing her to return to work at the end of that month (S. St. ¶26). Then in a January 31 letter Weisz extended Pough's reporting date to the Executive Leadership center in Florida to February 26, owing to her extenuating medical circumstances (S. St. ¶27).

In a February 2 email to Igo, Pough stated that "under force" she was "opting for discontinued retirement" (S. St. ¶28). She went on to describe Weisz's action toward her as "punitive" and to say that she "would not feel comfortable working for a manager of his caliber" (id.). Pough also wrote that "[Weisz] did not discuss a directed reassignment to [Executive Leadership] until after he received notification that [she] would be on an extended leave" (id.). Finally Pough told Igo that "another

_____

[9] From here on out the relevant events occurred during 2006. Hence the year designation will be omitted as to all those events.

8

African American employee was terminated with haste from [Executive Leadership]," that the employee's job was given to a white contract employee and that Pough was "certain there are plans for [her] position and/or salary which is why [Pough] was harassed and pressured during [her] sick leave recovery period" (id.).

Weisz responded to Pough's email in a February 6 letter in which he assured Pough that a job was available for her at Executive Leadership (S. St. ¶29). Weisz also reminded Pough that she had been informed of her relocation before she requested medical leave and that she also had been told--at the time that Executive Leadership was first transferred to "FAA Academy"[10]-- that there were no positions or duties that could be performed from Great Lakes (id.). Hence Pough had continued her job at that location only by working in a temporary "out-stationed/ virtual" position (id.).

Weisz's email had no effect on Pough. On February 10 she gave Weisz a signed statement of intent declining the administrative reassignment outside the commuting area and electing to exercise her eligibility for discontinued service retirement (S. St. ¶30).

---

[10] Neither party illuminates what the "FAA Academy" actually is, although this Court assumes that Weisz is referring to the October 2004 reorganization during which Management Development was renamed Executive Leadership.

On March 1 Pough communicated with an EEO counselor to claim that she had been discriminated against on the basis of race and retaliated against for her prior EEO activity when she received a February 6 email from Weisz stating that she must "report to [Management Development] or retire" (S. St. ¶31).  As a potential remedy Pough requested (1) that she be reinstated to her position and receive lost wages and (2) that disciplinary actions be taken against the involved management officials (S. St. ¶32).

One day later, on March 2, Pough's resignation from her position as a Personnel Management Specialist took effect (S. St. ¶33).  Weeks later, on March 29, the EEO counselor submitted an initial report concerning Pough's claim of discrimination and retaliation (S. St. ¶34).  And one week after that, on April 6, Pough filed a formal EEO charge, again asserting that she had been discriminated against and retaliated against on February 6 (S. St. ¶35).  On April 28 DOT accepted Pough's claim for investigation, characterizing her claim as a question "whether she was discriminated against based on her race (black) and in reprisal for prior EEO activity when she was forced to retire effective March 2" (S. St. ¶36).

During the ensuing inquiry the EEO investigator obtained statements from Pough, Weisz, Igo, Dix and Johnson (S. St. ¶37).  In his affidavit Weisz explained that he initially became Pough's supervisor while she was on a detail assignment at Great Lakes,

working on a special project for the Federal Personnel Payroll System. During that assignment, he added, Pough did not perform any duties for Executive Leadership, the department he directed (S. St. ¶38). As a result Weisz said (1) he never met Pough, (2) he had spoken to her only two or three times over the course of the preceding year by phone and (3) until her most recent EEO charge he had been unaware of both her race and any earlier EEO activity (<u>id</u>.).

Weisz went on to reiterate several of the facts already set forth here: that he had no tasks for Pough to perform at Great Lakes, that she was the only Executive Leadership employee who did not work in Florida and that Pough was needed in Florida to oversee contractors, students and other job responsibilities at that location (<u>id</u>.). Weisz added that he had explained his position to Pough when she asked why she could not continue to work for Executive Leadership from a distance, telling her that "[Executive Leadership] has no affiliation with the Great Lakes Regional Office" and that the two offices "are two separate lines of business" (<u>id</u>.). Igo repeated much of that information in his affidavit, although he did also confirm that FAA had no other Executive Leadership employees located at Great Lakes (S. St. ¶39).

In an August 25 email to the EEO counselor Pough complained about an asserted lack of thoroughness of the investigation (S.

St. ¶40).  She added that she did "not believe [she could] get a

proper investigation conducted" (id.).

About two weeks later, on September 8, the EEO released the

results of its investigation into Pough's charge (S. St. ¶41).

That final agency decision made no finding of discrimination (S.

St. ¶42).  Instead the agency decision found that Pough had

failed to make the requisite prima facie showing for either her

claim of race-based discrimination or her claim of retaliation

(S. St. ¶¶43-44, 47).[11]  In addition, the final agency decision

found that management officials had articulated a legitimate,

non-discriminatory reason for its reassignment decision and that

Pough had produced no evidence, either testimonial or

documentary, that the agency's explanation for its action was a

pretext for race-based discrimination or reprisal or that

rebutted the testimony of either Weisz or Igo (S. St. ¶¶45-46).

Finally the agency decision found that Pough had failed to

establish either a prima facie case of harassment based on race

or reprisal or a prima facie case of constructive discharge (S.

St. ¶¶47-48).

_____

[11]  Pough unsuccessfully attempts to deny Secretary's
statements of fact as to the contents of the final agency
decision by referring to the 31 statements of additional "facts"
that she has set forth in her response to Secretary's motion for
summary judgment (P. St. ¶¶43-45, 47-48; P. Add. St. ¶¶50-80).
Although Pough may of course disagree with the report's
substantive findings, the fact remains that Secretary has
accurately summarized its contents.

Pough filed the Complaint in this action after having received a right-to-sue letter from the Equal Employment Opportunity Commission on November 8 (Complaint ¶7). Secretary's motion for summary judgment followed.

## Resolution of Secretary's Motion

Pough contends that Secretary's decision to reassign her position to Florida was a retaliatory measure, motivated in response to her participation in conduct protected by Title VII. Pough also asserts that same decision was the byproduct of discrimination on the basis of her race and national origin. Finally Pough claims that she was the victim of a hostile work environment and constructive discharge. On analysis each of Pough's claims fails utterly.

### *Retaliation Claim*

First this opinion considers Pough's claim that she was discriminated against because she had earlier engaged in activity protected under Title VII--a practice commonly referred to as "unlawful retaliation" (Kampmier v. Emeritus Corp., 472 F.3d 930, 939 (7th Cir. 2007); see also Section 2000e-3(a)). As explained in Humphries v. CBOCS West, Inc., 474 F.3d 387, 404 (7th Cir. 2007)(internal citations and quotation marks omitted), a plaintiff has two ways of proving[7] Title VII retaliation:

---

[7] Although a plaintiff need not "prove" or "show" anything to stave off summary judgment--instead plaintiff need only identify a genuine issue of material (that is, outcome-

> Under the direct method, [plaintiff] must present
> direct evidence of (1) a statutorily protected
> activity; (2) a materially adverse action taken by the
> employer; and (3) a causal connection between the two.
> Under the indirect method, [s]he must show that after
> opposing the employer's discriminatory practice only
> [s]he, and not any similarly situated employee who did
> not complain of discrimination, was subjected to a
> materially adverse action even though [s]he was
> performing [her] job in a satisfactory manner.  Thus,
> the indirect method of establishing a prima facie case
> requires proof both of similarly situated employees and
> of the plaintiff's performing [her] job satisfactorily.

Under either method, if the plaintiff establishes a prima facie
case the burden of production shifts to the employer to present
evidence of a non-discriminatory reason for its employment action
(Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir.
1998)).  And if the employer meets its burden, "the burden shifts
back to the plaintiff to demonstrate that the employer's reason
is pretextual" (Moser v. Ind. Dep't of Corrs., 406 F.3d 895, 904
(7th Cir. 2005)).

Pough's attempt to establish a prima facie case of
retaliation fails under either the direct or indirect method, and
for the same reason:  Both methods require a plaintiff to show
that the employer "was aware of the allegation of discrimination
at the time" the adverse employment action took place (Luckie v.
Ameritech Corp., 389 F.3d 708, 715 (7th Cir. 2004)).  Luckie (id.

---

determinative) fact--this opinion perforce follows the vocabulary
employed in the caselaw.  But throughout the ensuing analysis
this Court has in fact imposed on Pough the lesser burden
described in the preceding sentence.

(internal citation omitted and emphasis in original)) goes on:

> [A]bsent such knowledge, there can be no causal link
> between the two.  It is not sufficient that [the
> decisionmaker] could or even should have known about
> [the employee's] complaints; [the decisionmaker] must
> have had actual knowledge of the complaints for her
> decision[ ] to be retaliatory.

And a like showing is required under the indirect method as well.

As Tomanovich v. City of Indianapolis, 457 F.3d 656, 668-69 (7th

Cir. 2006)(internal quotation marks omitted) explains:

> However, proof of retaliation under the indirect method
> presupposes that the decision-maker knew that the
> plaintiff engaged in a statutorily protected activity,
> because if an employer did not know the plaintiff made
> any complaints, it cannot be trying to penalize him for
> making them.

Accord, such cases as Durkin v. City of Chicago, 341 F.3d 606,

614 n.4 (7th Cir. 2003).

Here Pough has failed to produce admissible evidence that

creates even the required reasonable inference that Weisz--the

supervisor directly responsible for reassigning her from Great

Lakes to Florida--knew of her earlier EEO activity.  Pough simply

asserts that Weisz had access to her personnel file, but she has

produced no evidence of what information was actually retained in

that file.  Instead she relies only on the misplaced hope that

this Court will do what it cannot do--simply infer, without any

evidentiary showing at all, that material reflecting her earlier

EEO charges was kept in that folder.

Moreover, although Dix and Johnson and Smith knew of Pough's

earlier EEO activity, Pough has produced no evidence that any of
those FAA employees played a role in her reassignment to Florida.
To be sure, Dix and Johnson did reassign Pough to a position in
Management Development, the precursor to the current Executive
Leadership.  But no evidence indicates that either of them knew
of the October 2004 agency-wide reorganization that altered the
organizational structure and reporting lines of the various FAA
departments and that ultimately left Pough in a position subject
to geographic relocation.  Indeed, the fact that Dix and Johnson
reassigned Pough more than 18 months _before_ the October 2004
reorganization militates against such an inference.

Similarly, even if it were to be assumed that Weisz's direct
supervisor Igo knew of her prior EEO activity (but see n.6 and
accompanying text), Pough has not come up with any evidence
suggesting that Igo played a part in her relocation.  All of the
evidence demonstrates that the decision to relocate Pough was
made by Weisz alone, and there is nothing in the record that even
suggests Weisz actually knew of Pough's prior history of EEO
complaints, whether from Igo, from Dix, from Johnson or from any
other source.  Without such a showing, Pough's retaliation claim
against Secretary cannot succeed.  Secretary's motion for summary
judgment on that score must be and is granted.

**_Claim of Race-Based Discrimination_**

Pough contends that she was discriminated against on the

basis of her race when her position was reassigned from Great
Lakes to Florida.  This opinion turns to that issue.

To begin with, Pough has not adduced any direct evidence of
discrimination--she has presented nothing approximating "an
admission by the decision-maker that his actions were based upon
the prohibited animus" (Radue v. Kimberly-Clark Corp., 219 F.3d
612, 616 (7th Cir. 2000)), or even evidence "sufficient to create
a 'convincing mosaic' that 'allows a jury to infer intentional
discrimination by the decision-maker'" (Gusewelle v. City of Wood
River, 374 F.3d 569, 574 (7th Cir. 2004)).  As a result the
relevant question becomes whether she has presented sufficient
evidence via the burden-shifting approach taught by McDonnell
Douglas Corp. v. Green, 411 U.S. 792 (1973) to at least make a
prima facie case of discrimination (Gusewelle, 374 F.3d at 574,
though speaking of a male plaintiff (internal citations
omitted)):

> To do this, a plaintiff must show: (1) he is a member
> of a protected class; (2) he was qualified for the
> position; (3) he suffered an adverse employment action;
> and (4) a similarly situated employee not of the
> protected class was treated more favorably.  Once a
> plaintiff has made a prima facie showing of
> discrimination, the burden shifts to the defendant-
> employer to articulate a legitimate, non-discriminatory
> reason for the adverse employment action.  If the
> employer can do so, the burden shifts back to the
> plaintiff to present sufficient evidence to show that
> the employer's proffered reasons are merely a pretext
> for discrimination.

Pough strikes out in those terms because she has not shown

that "a similarly situated employee not of the protected class was treated more favorably" than she was. For two employees to be considered "similarly situated," it is generally required that they "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them" (language quoted in <u>Humphries</u>, 474 F.3d at 405). True enough, such inquiries are meant to be "flexible" without any need for "near one-to-one mapping between employees" (<u>id</u>.). But even under a generous application of the "similarly situated" language, Pough plainly has not shown that Weisz allowed a non-African-American employee whom he supervised to remain at Great Lakes while concurrently reassigning Pough to Florida.[8] After all, Pough was the only Executive Leadership employee located at Great Lakes, let alone the only African-American one.

Pough attempts to label Caucasian male David Pinner ("Pinner") as a similarly situated employee who was allowed to remain at Great Lakes when she was asked to relocate to Florida (P. Mem. 5). But Pinner cannot be considered "similarly situated": He was never employed by Executive Leadership or its

---

[8]  Pough's failure to point to a similarly situated employee who enjoyed better treatment is another reason for rejecting her retaliation claim, at least under the indirect method of making out a prima facie case of retaliation.

predecessor Management Development, and hence he was never supervised by Weisz or subject to Weisz's decisions regarding relocations.

Pough tries to deflect that conclusion by pointing to the fact that the two once shared the same supervisor and similar job responsibilities (P. St. ¶58; P. Mem. 12). But that argument must rest on the premise that the discrimination at issue occurred not when Weisz sought to relocate Pough but earlier--in February 2003--when Johnson and Dix reassigned her, and not Pinner, to a position that eventually became subject to a geographic relocation (P. Mem. 12). That contention, though is out of bounds because, as the *Facts* section has explained, Pough challenged that 2003 reassignment in an earlier EEO action (S. St. ¶12; S. Mem. 5), while her current complaint focuses on the 2005 relocation decision (Complaint ¶11).

In other words, the decision involving Pinner was made by Johnson and Dix and not Weisz, and it was an employment action separate and apart from the employment action being challenged here. So Pinner cannot be considered a "similarly situated employee," and Pough's prima facie case of race discrimination also fails.

There is a second fatal flaw in that race discrimination claim: Pough has proffered no evidence that even supports an inference that Secretary's decision to relocate her position to

19

Florida was pretextual--that it was a lie (<u>Humphries</u>, 474 F.3d at 407; <u>Brown v. Ill. Dep't of Natural Res.</u>, 499 F.3d 675, 683 (7th Cir. 2007)).  Secretary has advanced an unchallenged explanation for relocating Pough's position:  that Pough, an Executive Leadership employee who reported to a Florida-based Weisz, was needed to oversee contractors, students and other job responsibilities at the Florida location.  Any refutation of that must involve a showing (<u>McCoy v. WGN Cont'l Broad. Co.</u>, 957 F.3d 368, 372 (7th Cir. 1992)(internal quotation marks omitted)):

> by a preponderance of the evidence either (1) that the employer was more likely motivated by a discriminatory reason, or (2) that the employer's proffered reason is unworthy of credence.

Pough has not met that requirement.  Hence a second--and independent--failure dooms Pough's claim that she was discriminated against on the basis of race.

### *Claim of National-Origin-Based Discrimination*

What has been said in the just-completed discussion could also dispatch Pough's assertion that she was discriminated against on the basis of her national origin.  But that claim (whatever it may mean[9]) succumbs even earlier, at the pre-analysis stage, for Pough has failed to exhaust it.

As <u>Ester v. Principi</u>, 250 F.3d 1068, 1071 (7th Cir. 2001)

---

[9] Pough says nothing in her Complaint or in her response to Secretary's motion for summary judgment to suggest that her nation of origin is anything other than the United States.

teaches:

> Federal employees who seek to assert Title VII claims
> must exhaust the administrative remedies available to
> them in a timely fashion before they may assert their
> claims in a lawsuit.

Or, put a bit differently, "a Title VII plaintiff may bring only
those claims that were included in her EEOC charge, or that are
like or reasonably related to the allegations of the charge and
growing out of such allegations" (McKenzie v. Ill. Dep't of
Transp., 92 F.3d 473, 481 (7th Cir. 1996)(internal quotation
marks and citation omitted); accord, Ezell v. Potter, 400 F.3d
1041, 1046 (7th Cir. 2005)).

Here Pough's EEO charge raised claims only of race-based
discrimination and retaliation (S. Ex. A at 2).  Race and
national origin discrimination are two discrete concepts, set out
separately in Title VII.  Pough's omission of the latter claim
from her administrative charge leaves that claim unexhausted.

### Hostile Work Environment Claim

This opinion turns next to Pough's claim that she was
subjected to a hostile work environment when Weisz sought to
relocate her to Florida.  That claim fails as well, this time
because the conduct that Pough describes "is not severe or
pervasive enough to qualify as a hostile environment" (Ezell, 400
F.3d at 1047).  Indeed, nearly all of her asserted examples of
such conduct (1) took place well before Weisz made the decision
now at issue and (2) involved individuals who played no part in

21

that decision.

For a hostile work environment claim to be actionable, "the conduct of which [the employee] complains 'must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment'" (Roney v. Ill. Dep't of Transp., 474 F.3d 455, 463 (7th Cir. 2007), quoting Ezell, 400 F.3d at 1047). In addition Ezell, id. quotes these standards from Hostetler v. Quality Dining, Inc., 218 F.3d 798, 806-07 (7th Cir. 2000):

> Whether the harassment rises to this level turns on a constellation of factors that include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

More succinctly, Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997) reconfirms the adjectival standard announced in Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995): "The workplace that is actionable is the one that is 'hellish.'"

What Pough complains of does not even come close to that. She cites to only a single time (a few days before her surgery), but without specifics (she says only that Weisz "badger[ed] her"), and couples that with a totally nonspecific complaint that his actions were part of a larger pattern of behavior employed by FAA supervisors who "relentlessly retaliated against employees while they were recovering from life threatening illnesses" (S.

22

St. ¶¶23, 25, Ex. A at 50).  That kind of generalization

contrasts sharply with the kind of "abusive conduct" that has

been found sufficient to withstand summary judgment in such cases

as <u>Hostetler</u>, 218 F.3d at 807-08.

And beyond that, it will not suffice for a hostile work

environment claim to be fashioned by connecting such widely

separated dots--by pointing to incidents that occurred sometime

well in the past and were sufficiently discrete from the

employment action central to Pough's instant suit--the 2005

relocation decision.  As <u>Lucas v. Chicago Transit Auth.</u>, 367 F.3d

714, 727 (7th Cir. 2004) quoted from <u>Tinner v. United Ins. Co. of</u>

<u>Am.</u>, 308 F.3d 697, 708 (7th Cir. 2002)(ellipsis in <u>Lucas</u>'

quotation from that source):

> Acts...so discrete in time or circumstances that they
> do not reinforce each other cannot reasonably be linked
> together into a single chain, a single course of
> conduct, to defeat the statute of limitations.

That approach has led to the rejection of hostile work

environment claims in such cases as <u>Lucas</u>, <u>Tinner</u> and <u>Selan v.</u>

<u>Kiley</u>, 969 F.2d 560, 566-67 (7th Cir. 1992).

Here Pough has pointed to allegedly discriminatory incidents

that assertedly occurred in 1999 and continued through 2003, when

she was reassigned from her position as Personnel Management

Specialist at Great Lakes to the position of Personnel Management

Specialist for Management Development (S. St. ¶¶8, 14; P. Mem. 2-

5, P. Add. St. ¶¶50-80).  That reassignment, she contends,

eventually left her vulnerable to a further reassignment to Florida some years later, in 2005.

But however connected those events may be in Pough's mind, the fact remains that she has not demonstrated that Weisz--the supervisor who ultimately ordered her geographic relocation--ever knew of her history of filing EEO charges or of her prior difficulties with supervisors such as Dix, Johnson or Joseph Yokeley, Pough's supervisor in 1999 (P. Add. St. ¶56-60, 62, 64, 68). Pough has not even demonstrated that Weisz ever communicated with any of those individuals. It would be an impermissible stretch to treat Weisz's 2005 decision to relocate Pough to Florida as somehow part and parcel of whatever events transpired at Great Lakes from 1999 through 2003.

In short, Pough's hostile work environment claim fails, just as her earlier-discussed contentions have. Once again, this aspect of her lawsuit does not survive Secretary's motion for summary judgment.

**Constructive Discharge Claim**

Finally this opinion looks to Pough's claim of constructive discharge. That claim "is automatically foreclosed" by the just-stated conclusion that she was not subject to a hostile work environment claim (Roney, 474 F.3d at 463). To support a constructive discharge claim "a plaintiff's working conditions must be even more egregious than the high standard for hostile

work environment claims, because, in the ordinary case, an employee is expected to remain employed while seeking redress" (Boumehdi v. Plastag Holdings, LLC, 489 F.3d 781, 789 (7th Cir. 2007)).  Because Pough has not shown that her work environment was even hostile in the statutory sense, a fortiori it cannot be characterized as "so intolerable that a reasonable person would have felt compelled to resign" (a test quoted in Roney, 474 F.3d at 463; accord, Boumehdi, 489 F.3d at 789).

### Conclusion

There is plainly no genuine issue of material fact as to any of Pough's contentions, so that Secretary is entitled to a judgment as a matter of law.  Secretary's motion for summary judgment is therefore granted, and this action is dismissed with prejudice.

_____
Milton I. Shadur
Senior United States District Judge

Date:  September 8, 2008